United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JIM CARTER BYNUM,

          Petitioner,

  v.

BEN CURRY, Warden,

          Respondent.

_____/

No. C 09-02326 JSW (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

Petitioner Jim Carter Bynum, a California prisoner proceeding *pro se*, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the Court. Petitioner responded with a traverse. For the reasons set out below, the petition is DENIED.

## BACKGROUND

**I.    Procedural Background**

In January 2006, a jury in Santa Clara County Superior Court convicted Petitioner of second degree murder and found true allegations that he had personally used a firearm and intentionally discharged it, causing death. Petitioner was sentenced to 40 years-to-life in state prison.

1    Petitioner appealed his conviction, and the California Court of Appeal affirmed.

2  Petitioner appealed his conviction to the California Supreme Court, which denied review.

3  Petitioner filed the instant federal petition on May 27, 2009, and was permitted to return to

4  state court to exhaust additional claims.  The case was reopened on May 6, 2011, after

5  Petitioner filed notice that he was denied relief by the state high court.[1]

6  **II.    Factual Background**

7    The Court of Appeal summarized the facts of the case as follows:

8    On April 7, 2004, Mrs. Elizabeth James became concerned when she had not
     heard from her 24-year-old daughter, Mary James, for over a week. She went to
9    Mary's apartment and found her daughter's dead body on the bed in the
     bedroom of the apartment. Mary had blood coming out of her eyes, ears and
10   nose and had begun to bloat. Mary had a pen in her right hand, a partially
     smoked cigarette next to her and some books at the foot of the bed. There was a
11   cigarette butt near her head, ashes on her neck, and a burn mark on the mattress
     near the cigarette butt. Her fingers were curled as if she had been holding the
12   cigarette in her hand at the time of her death. A postmortem thermal wound to
     her chin could have been caused by a burn from a cigarette in her mouth when
13   she was shot.

14   Mary was killed by a "contact gunshot wound" to the top of her head; the bullet
     entered the top of Mary's skull, went through her brain, and lodged in soft
15   tissue behind her spinal cord. The bullet's vertical trajectory, as well as the
     objects in Mary's hands, were inconsistent with suicide. Nor had the
16   pathologist ever seen a self-inflicted wound to the top of the head. The bullet
     that was recovered from Mary's corpse likely came from a .38 Special.

17
     Because of the way Mary's body was positioned, with her head resting in the
18   corner of the room against which the bed was placed, it was very difficult to
     see her and there were no obvious signs of death or trauma. However, when the
19   body was moved, a blood stain became visible on the wall behind Mary's head,
     with strands of hair adhering to it. This indicated there was a large gush of
20   blood in motion that hit the wall followed by the hair from the head striking the
     wall. The physical evidence demonstrated that when she was killed she was
21   sitting on the bed, most likely in a forward-leaning position, exposing the top
     of her head in the direction of the doorway to the room.
22
     Mary had been diagnosed as bipolar approximately one and a half years earlier.
23   She had been a student at Santa Clara University when she began having severe
     mood swings between very manic times and very down times. She had been
24   prescribed Depakote but stopped taking her medication because it knocked her
     out to the point where she could not function or take care of her daughter, who
25   began living with Mrs. James. By January 2004, it became clear to family

26   ───────────────────────

27      [1] Petitioner attempted to add two additional claims in an amended petition, which the
     Court dismissed as untimely.  (*See* Docket No. 34.)  This action proceeds on the ten claims
28   presented in his original petition.

members that Mary was self-medicating with methamphetamines. Although Mrs. James paid the rent on Mary's apartment, Mary was being evicted. In the last month of her life, a lot of people came into Mary's life and apartment who were previously unknown to Mrs. James.

**The Milieu**

Verlin "Ching Ching" Lampkin, Maylene Osio, Vincent "Spud" Bell and Rotta Gonzalez were some of the those people. Lampkin met Mary in late March or early April 2004. He went to Mary's apartment to smoke crystal methamphetamine and "chill" with Bell and others. Her apartment was a place where people went to smoke dope. At the time, Lampkin was selling methamphetamine "for and with Spud" as well as using about half an ounce of the substance a week. Bell kept his drugs and a .45 caliber gun in a zippered black bag the size of a shaving kit which he usually kept right next to him. He also had a .38 caliber gun, which was black with a brown handle with a diamond pattern inset and a 9 millimeter gun. Lampkin saw Bell pull the .45 on a person named Javon Evans at Mary's house the Thursday or Friday before Mary was killed.

Maylene Osio was a methamphetamine addict and Lampkin's girlfriend. Lampkin beat her, but she stayed with him for drugs. Maylene met Mary through a person named André. She started going over to Mary's apartment with him and ended up living there. Mary's apartment was a "kickback... spot" so drug users did not have to "be out there in the street." "Everybody would go there and smoke." There were people coming and going all the time.

Bell was introduced to Mary by André a couple of weeks before she died. The day after he met her, he went to her apartment to meet Lampkin. [FN2] Thereafter, he went to Mary's apartment several times to meet with Lampkin, drop off drugs and pick up money. According to Bell, Mary was using methamphetamines before she met him, but he did not supply her with drugs. A day or two after he met Mary, she gave him the keys to her apartment.

> FN2. Bell referred to Verlin "Ching Ching" Lampkin throughout his testimony and pre-trial statement as "Ching Ching"; Maylene Osio generally referred to him as "Verlin," and both Lampkin and Maylene referred to Vincent Bell as "Spud." For ease of reference, we will refer to these witnesses as Lampkin, Bell and Maylene, and we will refer to witness Rotta Gonzalez as Rotta.

Rotta Gonzalez was also [a] methamphetamine user and a friend of Bell. Bell sold her drugs, and she gave him rides in exchange for gas money. It was Rotta's understanding that Mary was behind in her rent, and Bell agreed to give Mary the money to pay rent on the condition that he could sell drugs out of the apartment and Maylene could stay there. Mary was also romantically interested in Bell. She would try to stop him from leaving the apartment by hiding his stuff.

**Events Leading Up to Mary's Death**

The day and night before the murder, Maylene, Lampkin, Rotta, Bell and defendant were in and out of Mary's apartment, taking drugs. At about 2:30 or 3:00 a.m., Rotta gave Bell a ride to deliver drugs, but he fell asleep in the car

3

United States District Court

For the Northern District of California

and they returned to Mary's apartment. When they returned, Lampkin and Maylene were in the living room and defendant and Mary were in the bedroom talking. Rotta went into the bedroom to use the bathroom, and Bell lay down on the bed on his stomach to watch television. Mary was a few feet away from him. It was a little television and Rotta did not have her glasses on so she asked what they were watching. She recalled: "And I went and I looked, I noticed it was a porno, oh, man, you guys suck. And so I just turned around and then they were kind of laughing, they thought it was funny. And then I left." Defendant walked her out of the apartment and physically closed the door behind her. When she left, it was sunrise.

Maylene was at Mary's apartment doing her hair, "smoking cigarettes, smoking dope, and just sitting there, just hanging out." During the evening, Lampkin pulled a black gun out of his pocket and was showing it off. He walked in and out of the bedroom. People came and went, but at the end of the "party-thing," only Maylene, Lampkin, Bell and defendant were left. At 3:00 or 4:00 a.m., Lampkin fell asleep on the couch in the living room and Maylene decided to do laundry. Defendant, Bell and Mary were in the bedroom with the door closed.

Defendant was the first person to come out of the bedroom. Maylene and defendant were both high, and they talked about how irritating Mary could be when she would "lose it" and "be crazy" and say weird things. A couple of hours later, Mary woke up. Mary "just started talking and talking about weird stuff." Maylene went into the bedroom and saw Bell sitting in a chair trying to wake up; his dope, a pipe and a black gun were on a table near him. Mary and defendant were also in the bedroom. Mary would not stop talking, and at one point defendant yelled at her to "Calm the fuck down" and told her to get in the bathroom with him. Mary went into the bathroom with defendant and they shut the door. Maylene went back into the living room to iron a skirt. The door to the bedroom was shut. While Maylene was ironing, she heard a gunshot. Lampkin was still asleep. Bell came running out of the bedroom yelling, "We got to get out of here." He told Lampkin to "wake the fuck up." Twenty seconds later, defendant came out. Defendant looked panicked and nervous. He looked at Maylene and said: "I didn't mean to do it." Maylene walked into the bedroom, saw "Mary lying down on the bed... blood coming out of her head" and walked back out. Maylene grabbed her purse and clothes and stood at the door with Lampkin, waiting to leave, while defendant and Bell ran around. Defendant said, "Clean off the fingerprints," while he wiped the top of the entertainment center. They all left in Bell's car.

According to Lampkin, on the weekend before Mary was killed, he was at her apartment with Maylene and Bell. Maylene was his girlfriend at the time, and he sometimes gave her drugs. They played dice, Bell left, he and Maylene had sex in the living room, Bell returned, and then Lampkin fell asleep on the couch. When Lampkin fell asleep the gun was in his pocket. [FN3] The next thing he remembers was Maylene and Bell waking him up, saying "we have to get out of here quick." The gun was no longer in his pocket; he did not know what had happened to it. When he went into Mary's bedroom to grab his DVD player and phone charger, he saw Mary lying on the bed. At first he thought she was sleeping, but then he saw blood on the wall and realized "something wasn't right." Defendant was in the bedroom sitting on a stool about three feet away from Mary's bed with his head down talking to himself. [FN4] Lampkin heard defendant say: "Damn, I don't know why I gave it to her." Lampkin was so scared he grabbed his stuff and went straight out to the car to wait with

Maylene. About five or six minutes later, defendant and Bell came out and the four of them left in Bell's car. [FN5]

> FN3. Lampkin admitted that he told Detective Knopf that he was still awake when defendant arrived at Mary's apartment, and that Bell took the .38 revolver from him and handed it to defendant. However, Lampkin testified that he lied to the detective because he was afraid of being implicated in the murder if the police learned that he had the gun in his pocket the night before Mary was shot.

> FN4. Bell had introduced defendant to Lampkin as Bell's brother several days earlier.

> FN5. Lampkin was in custody awaiting sentencing at the time of trial. He had been charged with 12 burglaries that had been packaged into a plea bargain consisting of his guilty pleas to eight burglaries and a maximum sentence of five years. He was hoping that his testimony at defendant's trial would translate into leniency when he was sentenced.

According to Bell, on the Friday before Mary was killed, he dropped off drugs to Lampkin at Mary's apartment, accompanied by defendant, who drove him there. [FN6] They stayed about 15 minutes and left. Bell returned to Mary's apartment at about 7:00 p.m. on Saturday. Mary, Lampkin, Maylene and Dré were there. He got money from Lampkin and left with Rotta, who came to pick him up. Rotta brought him back to Mary's apartment later that night and Bell slept there that night. On Sunday, Bell left to make his rounds selling drugs.

> FN6. Bell testified that defendant is his wife's nieces's husband. They were such close friends they referred to each other as brothers, even up to the time of trial. Bell pleaded guilty to being an accessory after the fact to the murder of Mary James for driving away from the scene of the crime. He was prosecuted by the same deputy district attorney who was questioning him, and he received the maximum sentence for the crime. He was currently serving that sentence, as well as a sentence for transportation, distribution, and trafficking in methamphetamines.

Bell returned sometime Sunday night. Mary, Maylene and Lampkin were there. They were getting high, and Bell joined them. Defendant was not there. According to Bell, Rotta could not have seen him, Mary and defendant sitting on Mary's bed watching a movie, because she was not there. He eventually fell asleep on the floor in Mary's room. He could not recall if he had sex with Mary that night, although he admitted having sex with her one time that weekend.

Bell denied that Mary had sex with him in exchange for methamphetamine. Although he agreed that Mary was pretty heavily addicted to methamphetamine at that time, he denied knowing whether Mary had sex with men to get drugs. He "might have" told police that "any guy who had drugs who went over there got action." But he did not recall what he said to the police. [FN7]

> FN7. Bell testified that he did not recall telling police "I mean I wasn't hooked up with her. I mean, that right there, to come to find out was anybody went there you had action at ... [s]o that was not something that I wanted to be a part of."

5

In his audio taped statement to police, Bell admitted that he had sex with Mary, but he quickly discovered that she would have sex with anyone who came to her apartment, and he was afraid of contracting AIDS. After that, he mostly just got high with her. Nevertheless, he described their relationship as "locked into... mutual lust." The last time he had sex with Mary was the day before she died. Asked if Mary "would screw for dope," Bell said he did not know. She did not screw him for dope. Repeatedly asked if Mary had a sexual relationship with defendant, Bell insisted that, to his knowledge, she did not. Defendant never told Bell that he had sex with Mary. Bell added: "[D]on't get me wrong. He sat there and bullshitted with her, you know. Gave her a slap on her [*sic*] ass or whatever. She laughed, giggled. You know but as far as the actual do, no."

Bell awoke at 1:00 p.m. Mary was in the bathroom. He asked her to come out so that he could use it. She exited and he entered the bathroom. While he was in the bathroom, "[S]he got into an argument with whoever." A few minutes later, Bell heard a gunshot. He came out and saw Mary on the bed. She was not moving. Nobody was in the room with her. Bell did not see a gun, although he admitted that Lampkin carried a .38 and he carried a Glock 9 millimeter.

Bell denied that he killed Mary. He said he went into the front room and told Maylene and Lampkin they had to get out. They all left in his car. Bell said he was on parole, and he had to get out of there because he was on drugs and drugs were being sold out of the apartment. [FN8]

> FN8. Bell alternately denied or did not recall telling Detective Knopf that (1) he gave defendant the .38 the night before; (2) defendant shot Mary; (3) defendant was at the park with him, Lampkin and Maylene where he and defendant told the other two that if either one of them talked to the police about the murder, they were both dead; (4) defendant told Bell that he was playing a game of Russian roulette with Mary when she shot herself or he shot her; (5) defendant told Bell "I can't believe that I killed her"; (6) defendant killed Mary because she had stolen defendant's drugs. Bell also said he did not remember anything he said because he was "high" when he gave a statement to Detective Knopf.

An audiotape of Bell's statement to Detective Knopf was played for the jury. In it, Bell said that after getting high and playing dice all night, he fell asleep on Mary's bed at 1:00 or 2:00 a.m. When he awoke at 9:00 a.m., Mary, Maylene, Lampkin and defendant were in the front room. Bell immediately went to the bathroom. He could hear that Maylene, Mary and defendant were in Mary's room laughing. Lampkin was still asleep. Bell heard defendant say "Give me my shit," and Mary respond "Cut it out." "[T]hen they be saying something. I couldn't tell what they were saying." He couldn't hear what they were saying because Mary was talking gibberish. A short while later he heard a "pop" or a "bang." He came out of the bathroom to see what had happened; he didn't even have his underwear up. He saw Mary on her back on the bed. She had a pair of scissors in her hand. Nobody was in the room. He saw blood and he panicked. Everyone was in the front room, panicked. Bell was hysterical and defendant told him to calm down. Defendant said, "This never happened." He also said, in front of everybody, "I can't believe that I killed her." Defendant never said what happened. Lampkin was waking up and everyone was preparing to leave the apartment. Bell retrieved his backpack from Mary's room and they all left

in his car. In the backpack were Bell's drugs (crystal methamphetamine), his clothes, bullets for his .38 and his 9 millimeter gun.

Bell told Detective Knopf that defendant said he shot Mary over "[d]rugs, man, drugs." Bell also said Mary stole some of defendant's crack cocaine, [FN9] "[a]nd then something happened where they played a little game, a Russian roulette game, and that's what was told to me." According to Bell, defendant's "exact words" were: "'I spinned the one in the chamber and I told her "'We'll just play a little game then.' "Then she spinned it, all right. And then he-he had it pointed at her or whatever like this and he said, 'Okay, Now, you do it,' and I guess he said he gave it to her and he said she put it up here. Saying, 'she wouldn't.' Something about 'she wouldn't do it' or 'she didn't think I'd do it' or some shit like that to that effect and the next thing you know a hole."

> FN9. According to Bell, defendant did not sell crack cocaine, "[h]e just got high" on it.

The .38 gun used by defendant belonged to Bell. Bell gave defendant the gun the night before "because of the situation that was going on in there, in the front [room]... because there's a lot [of] people walking around and I had a lot of dope." Bell did not know what defendant did with the gun after the murder.

**Events After Mary's Death**

Lampkin, Maylene, Bell and defendant drove to Chris Findley's house. [FN10] In the car, Lampkin overheard defendant say "I shouldn't had did that." Bell told defendant to be quiet. At Findley's house, Maylene, Lampkin, and defendant smoked dope for a couple of hours with Findley's girlfriend. Defendant smoked crack cocaine in the kitchen. He had a revolver with a diamond-shaped pattern on the grip. At some point, defendant got a ride to Morgan Hill from Rodney Hobson at Bell's request. According to Maylene and Bell, the two of them and Lampkin left Findley's house and went to a motel. Maylene testified that at one point, defendant came to the motel to shower; he had a black gun.

> FN10. Chris Findley was an associate of Bell. Bell sold him methamphetamine. Findley also sold drugs as well as used them.

According to Lampkin, however, defendant returned to Findley's house with his truck. Bell then drove Lampkin and Maylene to a park, while defendant followed them there in his truck. At the park, the four discussed what the story was going to be in the event they were questioned about Mary's death. Bell told Lampkin to say that he and Maylene left at 10 p.m. the night before the shooting. At this point, defendant said that he and Mary had been playing Russian roulette and Mary shot herself on the first shot. Defendant told them that Mary had been "talking shit" and "pissed him off." "He said... he put a bullet in the gun, spun the chamber, handed it to her, and she shot herself." Defendant said if the police investigated, they were to say "[t]hat they was playing Russian roulette."

At another point, Lampkin, defendant and Bell walked about 10 or 12 feet away from Maylene. Defendant said he did not trust Maylene and wanted to get rid of her. Lampkin told defendant, "Don't even trip, I can take care of it." Defendant said, "All right, but if she talks then that's both you guys' ass." Lampkin took that to mean that defendant would "probably shoot us or

United States District Court

For the Northern District of California

something." Defendant told Lampkin that he was responsible for "handling her." [FN11] Lampkin told defendant not to worry about it because he could "keep her in check... she ain't going to talk to nobody."

> FN11. Lampkin testified that he understood this to mean that he was supposed to "[j]ust keep an eye on her... [a]nd make sure she doesn't talk to the police." He denied that he was supposed to beat her up if she got out of line, and also denied that he had hit her in the past to keep her in line. He admitted that she did what he said because he was giving her drugs.

After the discussion in the park, Lampkin got in the truck with defendant, and Maylene got in the car with Bell, and they drove to a motel. Defendant had the 9 millimeter gun on his lap. Lampkin did not see him bring it into the motel. Later, when Lampkin went to Bell's car to get methamphetamine out of the trunk, he saw the .45 caliber gun in the black shaving kit in which Bell kept his drugs.

Bell testified that the discussion in the park occurred seven or eight days after the murder, and that defendant was not there. Bell told Lampkin to say whatever he wanted, but to leave him and Maylene out of it. Bell felt sorry for Maylene because Lampkin used to "[b]rutalize her." In his statement to police, Bell said that a couple of weeks after the murder, the four of them met at a park. They discussed what to say to the police. If they were questioned by the police, they were to say that they had left the apartment at 9:00 a.m. the day before Mary was shot. Also, "[t]he point was made that, if anything was said,... that it was unpredictable about what would happen."

Maylene testified that the meeting in the park occurred after she had moved from the motel into the home of people who were friends of Lampkin. They agreed that if the police ever started questioning people, they would say they were not at Mary's apartment the night before she was killed. Afterwards, Lampkin told her that she was considered by the others to be the most likely to say something to the police, and that they were planning on getting her, but Lampkin convinced them that she would not break down.

After the meeting in the park, defendant visited Maylene one day. He asked her to promise she would not "break down" and say anything if she were questioned by the police. Maylene was scared and she was determined to stick to the story when questioned by police. However, when Lampkin came into the interview room and told her it was okay to say everything she knew, she did tell the police everything.

Defendant was employed as a welder. On April 5 and 6, he called in sick and did not go to work. A relative of defendant called defendant's employer to say that defendant had not been at work because his brother had been seriously injured in a car accident and defendant had been staying at the hospital with him. Defendant told his employer that his brother's name was Vincent Price. The next day, defendant went to work but he was acting strangely. He started crying and said he was living in a motel. Defendant said: "[I]t looks like I'm going to have to go away for a long time." He was so upset his employer told him to go home and get some rest.

8

**Other Forensic Evidence**

Two live rounds of .38-caliber ammunition were found in the bedroom. The parties stipulated that at the time of her death, Mary had alcohol, methamphetamine, amphetamine, nicotine and cotinine, but no cocaine metabolites, opiates or phencyclidine, in her bloodstream. They also stipulated that Bell was the source of the semen on the vaginal swab collected from Mary. Defendant was the source of DNA found on an orange Marlboro brand cigarette butt collected from a table in the dining room of the apartment, and of a finger print found on the mirror in the bathroom. Mary was the source of DNA on the bloodstained portion of the Newport brand cigarette butt collected from the apartment. A small baggie and a pipe, associated with smoking drugs, as well as short straws associated with snorting drugs, were found in the apartment. The absence of fingerprints was unusual.

The weapon was never recovered.

Ans. Ex. 8 at 2-13.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority under the first clause of Section 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but

9

**United States District Court**
For the Northern District of California

1  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

2  federal court on habeas review may not issue the writ "simply because that court concludes

3  in its independent judgment that the relevant state-court decision applied clearly established

4  federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be

5  "objectively unreasonable" to support granting the writ. *See id.* at 409.

6      "Factual determinations by state courts are presumed correct absent clear and

7  convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  This presumption is not

8  altered by the fact that the finding was made by a state court of appeals, rather than by a state

9  trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082,

10  1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).  A petitioner must present clear and

11  convincing evidence to overcome section 2254(e)(1)'s presumption of correctness;

12  conclusory assertions will not suffice. *Id.*  Under 28 U.S.C. 2254(d)(2), a state court decision

13  "based on a factual determination will not be overturned on factual grounds unless

14  objectively unreasonable in light of the evidence presented in the state-court proceeding."

15  *Miller-El*, 537 U.S. at 340.

16                                                   **ANALYSIS**

17      Petitioner raises the following grounds for relief: (1) the trial court's admission of

18  prejudicial evidence violated his rights to due process and a fair trial; (2) prosecutorial

19  misconduct with regard to witness Bell deprived Petitioner of a fair trial, due process and his

20  right of confrontation; (3) the trial court's failure to instruct on involuntary manslaughter

21  deprived him of a fair trial, his right to trial by jury and due process; (4) the trial court's

22  instruction on "other crimes" evidence deprived him of due process and a fair trial; (5) the

23  trial court's use of CALJIC No. 2.11.5 violated his rights of confrontation, to due process and

24  a fair trial; (6) the trial court's use of CALJIC No. 2.21.2 violated his due process rights; (7)

25  admission of trial witness Bell's prior statement violated Petitioner's Sixth Amendment

26  rights; (8) cumulative error; (9) the trial court's refusal to grant a continuance request

27  deprived Petitioner of due process, a fair sentencing and new trial hearing, as well as his right

28  to counsel of his choice; and (10) the trial court's imposition of a stayed sentence on the

**United States District Court**
For the Northern District of California

1    second firearm use enhancement violated his due process rights.

2    **I.    Admission of Evidence (Claim 1)**

3            Petitioner's first claim is that the trial court erred when it admitted evidence that Mary

4    and Petitioner had watched a pornographic movie together on the night of the murder and

5    that she may have been killed in a dispute over an exchange of sex for drugs.  Petitioner

6    claims the admission of this prejudicial evidence violated his rights to due process and a fair

7    trial.

8            The admission of evidence is not subject to federal habeas review unless a specific

9    constitutional guarantee is violated or the error is of such magnitude that the result is a denial

10   of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d

11   1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479

12   U.S. 839 (1986).  The Supreme Court "has not yet made a clear ruling that admission of

13   irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

14   warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)

15   (finding that trial court's admission of irrelevant pornographic materials was "fundamentally

16   unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of,

17   clearly established Federal law under § 2254(d)).

18           The Court of Appeal set forth the procedural background of the claim and then

19   rejected Petitioner's claim that the evidence was erroneously admitted:

20           Defendant complains that the trial court erroneously admitted gratuitous
         evidence that Mary had traded sex for drugs with people other than defendant,
21       that defendant had watched pornography with her, and that he had flirted with
         her by slapping her on the "butt." He argues that this evidence was irrelevant
22       (Evid. Code § 210); was more prejudicial than probative (Evid. Code § 352);
         and constituted inadmissible character evidence (Evid. Code § 1101). As such,
23       it "impermissibly reduced the People's burden of proof and created substantial
         risk that [defendant] was convicted on the basis of other inflammatory and
24       irrelevant conduct, rather than the evidence of the charged offenses, in
         violation of state and federal principles of due process." In addition, he argues
25       that the trial court should have ordered a foundational hearing on the existence
         of preliminary facts. For the following reasons, we disagree.
26
         *a. Factual Background*
27
         Prior to trial, the parties argued about the admissibility of Bell's statement that
28       defendant was a seller of crack cocaine and had convictions for possession for

sale or transportation of that drug. The prosecutor also sought admissibility of Rotta's testimony that (1) Mary was a methamphetamine user who could not pay her debts; (2) Mary had sex with defendant as payment for narcotics; and (3) Mary let defendant use her apartment as a place to sell narcotics as payment for narcotics. In addition, the prosecutor sought to prove that Lampkin "was part of this sort of sales organization" that was selling drugs and was holding drugs and holding weapons for the defendant. The prosecutor's theory was that defendant and Bell "acted together" to sell drugs, based on anticipated testimony that Bell and defendant referred to each other as brothers and were very close. "[I]n particular... there's going to be testimony in this case that the two were together all the time, that they would go on these, I believe from Rotta Gonzalez' testimony, that the two would go on drug sales together." The prosecutor also offered testimony that "when asked specifically why did this murder happen, [Bell] makes the statement because of drugs, and specifically because Mary James owed the defendant for drugs.... [¶] And I think that's important because of the fact that... Mr. Bell's statement to the police is that immediately before the shot is fired, that there is a statement heard by the defendant saying, 'Give me my shit.' And that Mr. Bell knew that to mean, give me my drugs, and/or, give me my money for drugs."

Defense counsel responded that Rotta had no personal knowledge that defendant was drug dealing, or that there was any personal relationship between defendant and Mary. Bell told the police defendant was *not* selling drugs, he just got high; and, as to the statement "Give me my shit," even if defendant said it, Bell had no personal knowledge as to what defendant may have been referring. Finally, he had no discovery showing any factual basis for the prosecutor's assertions. Defense counsel admitted defendant had a 1995 conviction.

The court ruled that, based on the offer of proof, all of the proffered evidence was relevant and probative. However, the court was concerned about the potential for prejudice, and particularly wanted to avoid tarring defendant with guilt by association with Bell: "[I]f Ms. Gonzalez heard Mr. Bell say, I'm taking over this place and I'm going to sell drugs here, well, that's pretty relevant as to what was going on here. However, if she's going to get up there and testify, I've heard them say, implicating Mr. Bynum, when Mr. Bynum never said that, there's a problem with that because that's prejudicial evidence. And I think that's a valid concern that the defense has. [¶] Now, your theory is that Mr. Bynum and Mr. Bell kind of acted in tandem as partners in crime and whatnot.... [T]hat's okay, I don't have a problem with that evidence. But I think we've got to be real specific when the testimony comes out as to wether we're talking about them as a group or as partners, or are they talking about Mr. Bell doing something and Mr. Bynum not." The prosecutor responded that he understood that the questioning needed to be precise, and he believed the admissibility of the evidence could be handled by objections on a question by question basis. Defense counsel maintained that Rotta should not be allowed to testify at all, but acknowledged that "there's going to be no question that the jury will be well aware that this girl's apartment, Mary James, was a place where people went to use copious amounts of methamphetamine and other drugs. But, again, Rotta... does not have personal knowledge of... where [defendant] fit in all of that."

The court ruled the evidence admissible, finding that the evidence was relevant to intent and motive, probative on those issues, and that the probative value outweighed the prejudicial effect. However, the court cautioned that "we're

12

going to have to be very careful of crafting the questions, allow complete cross-examination."

On the specific question of Rotta's testimony that Mary watched a pornographic movie with defendant and Bell, the court asked the prosecutor for an offer of proof as to its probative value. The prosecutor stated: "[T]he fact that Mary James was having sex with the defendant for... drugs, is certainly going to be relevant issues to the motive in this case. [¶]...[¶] [A]s I've indicated in my moving papers Rotta Gonzalez is going to indicate that she saw, she actually saw the defendant having sex with Mary James and that her impression was that it was for drugs. And this is just one piece of evidence that corroborates her testimony in that regard." Defense counsel objected that he did not see the relevance of the porno movie reference, and he did not think it added anything to the prosecution's theory. The court ruled that it did have probative value and the prejudicial effect did not outweigh it. However, the court instructed the prosecutor not to mention the porno movie in his opening statement, and to confirm with the witness before Rotta testified to it. "If she confirms what she said in the statement then I have no problem... with that." The court also cautioned the prosecutor to think about how to present evidence that the defendant had sex with Mary: "Because, again, I don't want the suggestion in front of the jury unless it's something that is... admissible" and the court indicated that if defense counsel objected to speculation or lack of foundation, the court might sustain an objection.

*b. Analysis*

We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Marshall* (1996) 13 Cal.4th 799, 832-833.) Most of the evidence to which defendant objects (in his supplemental opening brief) was never admitted at trial. For example, there was no testimony from any person that defendant was a drug dealer, or that defendant had ever had sex with Mary. In fact, the only evidence on those topics was to the contrary: in his statement to police, Bell said that defendant used crack cocaine, but did not sell it; and though he flirted with Mary by slapping her "butt" (making her giggle), to his knowledge, Mary never had sex with defendant. Moreover, Bell admitted that he did have sex with her, and that they were locked in a "mutual lust" relationship. Bell also denied that Mary had sex with him, or anyone else, for drugs. He suggested she was merely promiscuous.

As defense counsel anticipated, there was ample evidence that Mary and her newfound friends were methamphetamine users, that Bell was a methamphetamine dealer, and that Mary's apartment was the place where Bell and the others went to use and/or sell drugs. Furthermore, there was ample evidence that Mary's killing was tied to her involvement with drug use and drug users, and that drugs provided the motive for the killing. Defendant was in her apartment because he was a friend of Bell; Bell carried guns to protect himself and his stash of drugs; he gave defendant the gun with which Mary was shot; immediately before the shot was fired, Bell heard defendant say "Give me my shit." Finally, when asked by the police about the motive for the killing, Bell responded "drugs, man, drugs." As the Attorney General also points out, testimony about everyone's drug use was also relevant to the witnesses' abilities to accurately perceive and recollect events; evidence of defendant's drug use was also relevant to his mental state. [FN12] Under these circumstances, the court did not abuse its discretion in allowing extensive evidence of drug use by Mary, defendant and the others.

FN12. The jury was instructed on the effect of voluntary intoxication on mental state.

The court did not err by failing to conduct a foundational hearing pursuant to Evidence Code section 402. The prosecutor was entitled to prove that defendant was a drug dealer who traded drugs for sex with Mary if he could do so with admissible evidence. The prosecutor identified the sources of his information. The court was well aware of the potential prejudice to defendant if the prosecutor's assertions were shown by way of insinuations and impressions. To that end, the court cautioned the prosecutor to confirm the anticipated testimony with his witnesses before calling them to testify, and to be precise in his questions. In our view, the court did not abuse its discretion in determining that the prosecutor's offers of proof were foundationally sufficient. "The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas* (1995) 12 Cal.4th 415, 466 (*Lucas*).) As it developed, the prosecutor's evidence did not pan out and was never presented. Defendant was not prejudiced by the trial court's failure to hold a foundational hearing to test the existence of facts which were never presented to the jury.

As for the fact that defendant watched pornography at dawn with Mary and Bell, "[t]he very irrelevance of the evidence... without proof or even evidence of the preliminary fact" - that defendant traded dugs for sex-militates against finding this comment prejudicial. "This was not inherently prejudicial evidence, the admission of which may require reversal." (*Lucas*, *supra*, 12 Cal.4th at p. 468.)

Likewise, we discern no abuse of discretion under Evidence Code section 352, based upon the prosecution's anticipated evidence and theory at trial. In light of the actual evidence adduced at trial, of course, Rotta's testimony proved to be of marginal relevance, at best, since there was no evidence that defendant and Mary ever had sex. By the same token, its prejudicial potential was minimal. In the absence of evidence that Mary had sex with defendant, the evidence that she watched something pornographic on a small television at dawn with Bell and defendant had no "sinister overtones" and provided no traction for any inference that defendant "was in the predatory process of demanding sex when the shooting occurred." Rotta's testimony mentioned the television show's content in passing, even as it established that Mary was alive at sunrise. Furthermore, her testimony tended to show that Bell, Mary and defendant viewed the television show's content as funny rather than erotic, and that defendant did not even stay to watch it; instead, he got up and walked Rotta to the door. As presented, the evidence was not unduly inflammatory, especially when considered in light of the properly admitted evidence of rampant drug use among Mary and the witnesses. Thus, even assuming arguendo it was error to admit evidence that defendant, Bell and Mary watched pornography on television, there is no probability that the error prejudiced defendant under the California Constitution. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) And, in our review, the admission of this evidence did not rise to the level of federal constitutional error. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70 (*McGuire*); *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378.)

In his reply brief, defendant expands his attack to include "evidence about Ms. James trading sex for drugs (with others), [defendant] flirting with Ms. James (slapping her on her butt), and pathology indicating she had sex soon before death; on top of all this was evidence of violence and misogyny on the part of

14

1  Lampkin toward the other woman present, Ms. Osio."

2  Putting aside the fact that defendant never objected below to this evidence, and
3  did not advert to it in his opening brief, this court has found no evidence that
   *Mary* traded sex for drugs. Bell denied it. There was evidence that *Maylene*
4  traded sex for drugs. Lampkin admitted he used drugs to control her. Lampkin
   denied that he beat her, although both Maylene and Bell said he did. This was
5  not gratuitous evidence of sex and violence. It was relevant to explain what
   defendant meant when he told Lampkin in the park to "handle" Maylene so that
   she did not tell the police what she knew. Defendant's statement to Lampkin, in
6  turn, was relevant to consciousness of guilt.

7  As for the evidence that Mary had sex soon before her death, defense counsel
   *stipulated* that the semen found in Mary came from Bell. This evidence not
8  only cleared defendant of having sex with Mary that weekend, it also squarely
   pointed to Bell as her sexual partner and, along with other evidence that he sold
9  methamphetamine and she used it, not cocaine (defendant's drug of choice),
   and that she often took his stuff and hid it from him so that he would not leave
10 her apartment, provided support for defendant's claim that Bell killed Mary.

11 As for Bell's statement to police that defendant was not above flirting with
   Mary by slapping her on the "butt" and making her giggle, the statement was
12 made in passing and in the broader context of Bell's denial that defendant had a
   sexual relationship with Mary. The reference was not unduly inflammatory and
13 could not have prejudiced defendant. The defense did not ask to have the
   reference deleted from the transcript and the audiotape, as it did with a passing
14 reference to defendant's criminal record, and the court did not err by failing to
   edit it out on its own motion. Assuming arguendo it was error not to excise the
15 reference to butt-slapping, it is not reasonably probable that defendant would
   have obtained a better result in the absence of the error. (*Watson*, *supra*, 56
16 Cal.2d at p. 836.) Nor did the reference rise to the level of a federal
   constitutional violation. (*McGuire*, *supra*, 502 U.S. at p. 70.)

17
18 Finally, defendant argues that even if the court's pretrial evidentiary rulings
   were correct at the time they were made, reversal is required because, without
19 the foundational basis for the admitted evidence, "gross unfairness" resulted
   from the admission of "this visceral evidence, even in the truncated form in
20 which it was admitted." For the reasons we have discussed above, we reject
   this contention. We reiterate that, in our view, none of the evidence actually
   admitted was unduly inflammatory.

21
22 Ans. Ex. 8 at 13-20.

23      The state appellate court reasonably concluded that none of the evidence that was

24 actually admitted had the prejudicial effect that Petitioner claims.  The trial court warned the

25 parties that "we're going to have to be very careful of crafting the questions, [and] allow

26 complete cross-examination."  *See supra* at 12.  Although the prosecution sought to admit as

27 part of Rotta's testimony that Petitioner had sex with the victim, the proffered testimony was

28 never actually presented to the jury.  Rotta never testified at trial that Petitioner and Mary had

United States District Court

For the Northern District of California

1   sex or that there was an agreement between them to trade sex for drugs. *Id.* at 3. With

2   respect to the events leading up to the murder, Rotta testified that Mary, Bell and Petitioner

3   were in the bedroom watching what she discovered was pornography. Rotta stated, "And so

4   I just turned around and then they were kind of laughing, they thought it was funny. And then

5   I left." *Id.* at 4. As the state appellate court observed, the incident "had no 'sinister

6   overtones' and provided no traction for any inference that defendant 'was in the predatory

7   process of demanding sex when the shooting occurred.'" *Id.* at 14. Rotta also testified that

8   Petitioner did not stay to watch but left the room and walked her to the door. *Id.* at 4.

9   Accordingly, it cannot be said that Rotta's testimony was unduly prejudicial.

10         Furthermore, the evidence clearly indicated that Mary was involved sexually with Bell

11   and not Petitioner. Bell himself characterized their relationship as one of "mutual lust" and

12   denied ever trading sex for drugs. *See supra* at 6. Bell admitted that he was the one who had

13   sex with Mary that weekend, which was confirmed by the semen found in Mary. Rotta

14   testified that Bell gave Mary money for rent in exchange for the use of her home to sell

15   drugs, not for sex. With respect to Petitioner, Bell testified that Mary and Petitioner had

16   what appeared to be nothing more than a flirtatious exchange. There was no evidence that

17   Petitioner and Mary ever engaged in or bargained for sex in exchange for drugs. Based on

18   this record, the admission of the contested evidence did not constitute an error of such

19   magnitude that it denied Petitioner a fundamentally fair trial guaranteed by due process. *See*

20   *Kernan*, 197 F.3d at 1031. Nor was the admitted evidence either irrelevant or overtly

21   prejudicial to indicate a due process violation, which in any case would not warrant issuance

22   of the writ in this case because the state courts' rejection of this claim was not contrary to, or

23   an unreasonable application of, clearly established Federal law under § 2254(d)). *See*

24   *Yarborough*, 568 F.3d at 1101. Accordingly, this claim is DENIED as without merit.

25   **II.**     **Prosecutorial Misconduct (Claim 2)**

26         Petitioner claims that the prosecutor committed misconduct when he argued in closing

27   that Bell could have said anything in his testimony because he had already pleaded guilty to

28   being an accessory to murder and been sentenced for that offense. Petitioner claims the

1   prosecutor's actions deprived him of a fair trial, due process and his right of confrontation.

2       A defendant's due process rights are violated when a prosecutor's misconduct renders

3   a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v.*

4   *Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of

5   alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

6   prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were

7   improper; if so, the next question is whether such conduct infected the trial with unfairness.

8   *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). A prosecutorial misconduct claim is

9   decided "'on the merits, examining the entire proceedings to determine whether the

10  prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction

11  a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted),

12  *cert. denied*, 516 U.S. 1017 (1995).

13      The first factor in determining whether misconduct amounted to a violation of due

14  process is whether the trial court issued a curative instruction. When a curative instruction is

15  issued, a court presumes that the jury has disregarded inadmissible evidence and that no due

16  process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477

17  U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but

18  held that the trial was fair since curative actions were taken by the trial judge); *Tan*, 413 F.3d

19  at 1115 ("we presume jurors follow the court's instructions absent extraordinary

20  circumstances"). This presumption may be overcome if there is an "overwhelming

21  probability" that the jury would be unable to disregard evidence and a strong likelihood that

22  the effect of the misconduct would be "devastating" to the defendant. *See Greer*, 483 U.S. at

23  766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions five

24  different times to consider only the evidence presented, and not its sympathy for the victim's

25  life story).

26      Other factors which a court may take into account in determining whether misconduct

27  rises to a level of due process violation are: (1) the weight of evidence of guilt, *compare*

28  *United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt)

United States District Court
For the Northern District of California

17

United States District Court

For the Northern District of California

1  *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury

2  and lack of curative instruction, new trial required after prosecutor's reference to defendant's

3  courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern,

4  *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to

5  a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to

6  disclose information showing potential bias of witness especially significant because

7  government's case rested on credibility of that witness); and (4) whether a prosecutor's

8  comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

9       The Court of Appeal set forth the factual background of the claim:

10       a. *Factual Background*

11       The challenged comments, which are italicized below, occurred in the context
of the following argument by the prosecutor: "You saw that when Mr. Bell

12  finally came into court that he did everything in his power to protect the
defendant. [¶] And there's an instruction I want to read to you about prior

13  statements that a person may have made, it's important. You may have already
got this, but: [¶] Evidence that at some other time, a witness made a statement

14  or statements that is or are inconsistent or consistent with his or her testimony
in the trial may be considered by you, here's the key part, not only for the

15  purpose of testing the credibility of the witness but also as evidence of the truth
of the facts as stated by that witness on that former occasion. [¶] Okay, so this

16  is an obvious point, it's one that needs to really be emphasized here. The fact
that Vincent Bell came in and told you, I was at Mary James apartment. I

17  passed out. When I woke up, I heard a gunshot, she's dead. Jim Bynum wasn't
there. [¶] The fact that he said that, now, the fact that on this prior occasion, he

18  gave this three-hour statement saying, no, the defendant shot her, and he
confessed to me. [¶] Not only can you use that prior statement to consider that

19  he is lying now, but you're also allowed to look at that prior statement and say,
I believe that what he said on that prior occasion was the truth. You can use

20  that as evidence in your deliberations as to what really happened. And that may
seem obvious to you; sometimes people think, we didn't know we could

21  consider that. But you can. You are allowed to look at what he told Detective
Knopf and say, is that what really happened? [¶] *You say that the defendant,*

22  *Vincent Bell, is in a position where he can say anything now. He can say*
*anything in the world now. He's pled guilty. He's been sentenced. He's serving*

23  *his sentence. If he wanted to come in here and say, I killed her, he could do it.*
*If he wanted to come in here and say, yeah, Mr. [Prosecutor], you screwed up,*

24  *you got the guy. Oh, by the way, I already pled guilty, you can't prosecute me*
*again. He could have said that. [¶] He could have also said that Verlin*

25  *Lampkin killed her. He could have said Maylene Osio killed her. He could have*
*said anything.* In fact, you noticed, when I did my opening statement, I didn't

26  mention what he was going to say. Now we know what he said. He told the
police that night, why did this... killing happen? What was it that took place to

27  kill Mary James? The statement was, drugs, man, drugs.... Probably [the] most
truthful thing that Vincent Bell has ever said in his life. All right, drugs, man,

28  drugs." (Italics added.)

The prosecutor's argument continued (for three more transcript pages) and then a 10-minute break was taken. The prosecutor resumed argument (for another six pages of transcript). Then the noon recess was taken. After the noon recess, defense counsel registered an objection to the prosecutor's argument.

Asked by the court if he was requesting an admonition or making a motion for mistrial, defense counsel responded: "I don't think that an admonition would be sufficient. And again, let me leave it at that." The court took the objection under submission so it could review its notes about the pretrial motion and Bell's testimony. The prosecutor added that, under "the whole *Kellet* line of cases," there was no dispute that he could no longer prosecute Bell for murder because Bell had already pleaded guilty to "the same operative facts."

As anticipated, defense counsel argued that Bell had the motive, the gun, and the criminal disposition to kill Mary and was in fact the true killer. He reminded the jury that a reliable confidential informant had told police that Bell was the killer and that Bell told his wife, in a phone call from the police station, that he was going to be charged with murder. Defense counsel discounted the suicide theory, and Bell's trial testimony. Addressing the prosecutor's comments, defense counsel argued that Bell was not called by the defense as a witness to protect defendant. "Mr. [Prosecutor] suggests that he was free to say anything he wanted. He had pled as an accessory. But if he was free to say anything he wanted to, why didn't he just say, oh, I killed Mary James? He didn't say that. He just said, I'm trying to tell you that Mr. Bynum wasn't there. Consider it carefully, please. Who is benefiting from those? I mean, on the surface, superficially, it may seem like he comes in to do that for Mr. Bynum's sake. But obviously, that's madness, because there's a prior inconsistent statement that's going to come into evidence that totally, you know, contradicts his testimony that Mr. Bynum wasn't there. So that's not what's going on. For whose benefit? Who benefited? He did. Bell did. [¶] Why do I say that now? Because he's in prison. And that review, that environment, he wants to be able to insulate himself and say, I never testified against nobody. I'm not a rat. I'm no informer. I went down there and I didn't testify. I didn't squeal on anybody. To protect himself. To cover himself. Not for Mr. Bynum's benefit, for his own benefit. [¶] And, in fact, the fact of the matter is, sadly, that because he claimed not to be able to remember any of his interview with Detective Knopf back in April, we couldn't cross-examine him on it. We couldn't cross-examine him on it. And when you can't cross-examine a witness, you have very little help, hope of getting to the truth, getting to the bottom of things. So that was another benefit to him; it insulated him from cross-examination on that statement."

After the jury retired to deliberate, the court held a hearing on defense counsel's objection, which it interpreted as a mistrial motion. The court noted that the objection was made belatedly, and not when the prosecutor made the comment. The court observed that it had "suggested perhaps some carefully worded admonition to the jury, once we fleshed out whether the objection was valid or not. And you indicated, and I think probably tactically correctly,... that you didn't feel that an admonition would be appropriate if, for anything, calling attention to the comments back to the jury and then giving them an admonition may exacerbate whatever the problem there was. So you weren't asking for an admonition to the jury; you were asking for the mistrial, because you felt the damage had been done." Defense counsel responded: "That's correct, your Honor."

The court ruled that the prosecutor was not trying to mislead the jury, and that

United States District Court

For the Northern District of California

1   its reading of the *Kellet* cases indicated that Bell's guilty plea to being an
2   accessory to murder would preclude the prosecution from charging him now
    with murder, even if he had said he killed the victim in this case. Further, the
3   court found that the prosecutor had only asked the jury to draw a reasonable
    inference from the evidence, "that [Bell] plead guilty, that he was serving the
4   maximum for what he pled guilty to, and now he could come in and he could
    say just about anything without fear of some other... later reprisal." The court
5   noted that as an added safeguard it had instructed the jury with CALJIC 1.02.
    [FN13] Finally, the court ruled that it did not find the prosecutor's comment
6   sufficiently prejudicial or misleading, based on the evidence before the jury, to
    justify a mistrial. Asked to comment, the prosecutor added that it was "sort of
7   laying a trap to not object during closing argument, think about it over lunch,
    and then come back and say, now, I want a mistrial. And it's the most serious
8   remedy that you have in a trial, is to say, the entire trial is thrown out by
    something I said, where I think, at best, if I was in error, it was easily remedied
9   if there was a problem on my part, on what I said, by telling the jury, disregard
    what he said and form your own conclusion about what his exposure was, or
10  don't consider it at all."

11          FN13. CALJIC 1.02 states, in part: "Statements made by the attorneys
            during the trial are not evidence."

12  b. *Applicable Legal Principles*

13  1. Prosecutorial Misconduct

14  "The applicable federal and state standards regarding prosecutorial misconduct
    are well established. A prosecutor's... intemperate behavior violates the federal
15  Constitution when it comprises a pattern of conduct so egregious that it infects
    the trial with such unfairness as to make the conviction a denial of due process.
16  Conduct by a prosecutor that does not render a criminal trial fundamentally
    unfair is prosecutorial misconduct under state law only if it involves the use of
17  deceptive or reprehensible methods to attempt to persuade either the court or
    the jury. When the claim focuses upon comments made by the prosecutor
18  before the jury, the question is whether there is a reasonable likelihood that the
    jury construed or applied any of the complained-of remarks in an objectionable
19  fashion." (*People v. Smithey* (1999) 20 Cal.4th 936, 960, internal quotation
    marks and citations omitted.) "In conducting this inquiry, we 'do not lightly
20  infer' that the jury drew the most damaging rather than the least damaging
    meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th
21  894, 970; accord, *People v. Lopez* (2008) 42 Cal.4th 960.)

22  Ans. Ex. 8 at 22-26.

23          The state appellate court denied the claim, finding that the prosecution's statements

24  did not constitute misconduct:

25          As noted above, our task is to determine whether there is a reasonable
            likelihood that the jury construed or applied the complained-of comment in an
26          objectionable fashion, and we do not lightly infer that the jury drew the most
            damaging rather than the least damaging meaning from the prosecutor's
27          statements. The trial court viewed the comments as no more than an invitation
            to the jury to draw the inference, from the evidence before it, "that [Bell] pled
28          guilty, that he was serving the maximum for what he pled guilty to, and now he

could come in and he could say just about anything without fear of some other... later reprisal." In fact, the evidence before the jury included not only Bell's testimony about his plea and sentence, but also his pretrial statement, in which he was told by Detective Knopf that the District Attorney might decide to charge him with murder, and he repeated that threat to his wife in a recorded phone call to her ("I'm being charged with the murder, yeah").

Furthermore, the jury was instructed that it "must decide all questions of fact in this case from the evidence received in the trial and not from any other source." The prosecutor did not mention *Kellet* or section 654, or double jeopardy or any other "law," and the jury received no instruction on section 654, or the *Kellet* line of cases on multiple prosecution. In our view, there is no reasonable likelihood on these facts that the jury interpreted the prosecutor's comments in an objectionable fashion.

Nor do we agree that the prosecutor's comments "amounted to powerful vouching for a key witness, because it comprised blanket assertions of law based on presumed expertise outside the trial evidence that the jurors had no way to second guess." As noted above, the challenged remarks mentioned no legal precepts; they referenced nothing more than Bell's testimony. We therefore conclude that defendant's motion for mistrial was properly denied. The trial court concluded that defendant did not suffer incurable prejudice from the prosecutor's comments, and we find no basis for finding that the court abused its discretion. For the same reasons, the trial court did not abuse its discretion in denying defendant's motion for a new trial based on the same argument. (*People v. Williams* (1997) 16 Cal.4th 153, 210 (*Williams*).) Perforce, defendant's federal constitutional rights were not violated either.

Ans. Ex. 8 at 28-29.

Even if we assume that the comments at issue were improper, it does not appear that the conduct infected the trial with such unfairness as to make the resulting conviction a denial of due process. *See Sublett*, 63 F.3d at 929. The state appellate court appropriately considered the prosecution's statements in the context of the entire proceedings, including the fact that "the evidence before the jury included not only Bell's testimony about his plea and sentence, but also his pretrial statement, in which he was told by Detective Knopf that the District Attorney might decide to charge him with murder, and he repeated that threat to his wife in a recorded phone call to her," and found that "there is no reasonable likelihood on these facts that the jury interpreted the prosecutor's comments in an objectionable fashion." Ans. Ex. 8 at 28. Furthermore, we presume that the jury followed CALJIC 1.02, which states in part: "Statements made by the attorneys during the trial are not evidence." *See supra* at 20; *see Tan*, 413 F.3d at 1115. Although not specifically given as a curative instruction, the trial court considered it a sufficient safeguard to address defense counsel's concerns. *See*

United States District Court

For the Northern District of California

*supra* at 19-20.  The state appellate court also noted that the jury was given the instruction that "'it must decide all questions of fact in this case from the evidence received in the trial and not from any other source.'" *Id.* at 20.  Against this presumption – that the jury has disregarded inadmissible evidence and that no due process violation occurred –  Petitioner has not shown that there was an "overwhelming probability" that the jury was unable to disregard evidence and a strong likelihood that the effect of the misconduct was "devastating" to Petitioner.  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16.

In determining whether misconduct rises to a level of due process violation, we may also consider the weight of evidence of Petitioner's guilt which was considerable.  Petitioner was the only person with Mary in the bedroom other than Bell around the time of the murder. Bell testified that he was in the bathroom when he heard a gunshot.  Petitioner also made several incriminating statements immediately after the murder, including "I didn't mean to do it," and "I can't believe that I killed her."  *See supra* at 4, 6.  Bell's statement to the police included Petitioner's admission that he shot Mary over drugs.  Bell also admitted giving Petitioner his .38 Special which was the gun used in the killing.  Furthermore, Petitioner's story that Mary shot herself playing Russian roulette was not supported by the forensic evidence; the bullet's vertical trajectory from the top of Mary's skull and the fact that she was holding objects in her hands were not consistent with a self-inflicted wound.  Petitioner also later tried to convince Bell, Lampkin and Maylene to give the same story, *i.e.*, that Petitioner and Mary were playing Russian roulette, if questioned by the police.  Lastly, there was Petitioner's strange behavior at work and comment that he was "going to have to go away for a long time." *Id.* at 8.  In light of such overwhelming evidence, it is not likely that the prosecution's comments in closing so infected the trial as to violate Petitioner's right to due process.

Furthermore, the statement at issue occurred in isolation and only in the prosecution's closing statement, and not as part of an ongoing pattern.  *See Sunn*, 807 F.2d at 809.  Nor did the prosecutor's comment either misstate or manipulate the evidence.  *See Darden*, 477 U.S. at 182.  As the state appellate court noted, the comments were factual in nature in that they

**United States District Court**

For the Northern District of California

referred only to the content of Bell's testimony and no "legal precepts." *See supra* at 21. With respect to whether the alleged misconduct related to a critical part of the case, *see Giglio*, 405 U.S. at 154, Petitioner argues that the prosecution's statements went to the heart of his defense, *i.e.*, that Bell was responsible for the shooting. Petitioner claims that the prosecution's statements constituted "improper vouching for a key witness" and was "serious error." Trav. at 6-7. The state appellate court rejected this argument, finding that the prosecution's comments constituted a reasonable inference from the evidence of the plea agreement, *i.e.*, that Bell could testify to anything without fear of repercussions. Defense counsel had ample opportunity to and did in fact challenge the credibility of Bell's testimony, including setting forth his own speculation for Bell's motivation for testifying as he did – to preserve his reputation in prison as not being a snitch. *See supra* at 19.

Ultimately, Petitioner is not entitled to habeas relief because the error, if any, did not have a substantial and injurious effect or influence in determining the jury's verdict. *Sublett*, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). For the reasons discussed above, it cannot be said the prosecution's comments constituted misconduct that rendered Petitioner's trial "fundamentally unfair." *Darden*, 477 U.S. at 181. The state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)). Accordingly, this claim is DENIED as without merit.

### III.    Improper Jury Instructions (Claims 3-6)

Petitioner raises four claims challenging the jury instructions: (A) the trial court's failure to instruct on involuntary manslaughter deprived him of a fair trial, his right to trial by jury and due process (claim 3); (B) the trial court's instruction on "other crimes" evidence deprived him of due process and a fair trial (claim 4); (C) the trial court's use of CALJIC 2.11.5 violated his rights of confrontation, to due process and a fair trial (claim 5); and (D) the trial court's use of CALJIC 2.21.2 violated his due process rights (claim 6).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show

United States District Court

For the Northern District of California

1  that the ailing instruction by itself so infected the entire trial that the resulting conviction

2  violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*,

3  414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)

4  ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even

5  "universally condemned," but that it violated some [constitutional right].'").  The instruction

6  may not be judged in artificial isolation, but must be considered in the context of the

7  instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.  In other words, the

8  court must evaluate jury instructions in the context of the overall charge to the jury as a

9  component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982)

10  (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314,

11  317 (9th Cir.1988).

12       A habeas petitioner is not entitled to relief unless the instructional error "'had

13  substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507

14  U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words,

15  state prisoners seeking federal habeas relief may obtain plenary review of constitutional

16  claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual

17  prejudice." *Id.*

18       **A.**    **Instruction on Involuntary Manslaughter (Claim 3)**

19       Petitioner was convicted of second degree murder.  His first jury instruction claim is

20  that the trial court improperly failed to instruct on the lesser included offense of involuntary

21  manslaughter, which deprived him of a fair trial, his right to trial by jury and due process

22  (claim 3).

23       The Court of Appeal rejected this claim:

24       Errors in jury instructions are questions of law, which we review de novo.
     (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) "'"It is settled that in criminal

25       cases, even in the absence of a request, the trial court must instruct on the
     general principles of law relevant to the issues raised by the evidence.

26       [Citations.] The general principles of law governing the case are those
     principles closely and openly connected with the facts before the court, and

27       which are necessary for the jury's understanding of the case." (*People v. St.
     Martin* (1970) 1 Cal.3d 524, 531)'" (*People v. Breverman* (1998) 19 Cal.4th

28       142, 154 (*Breverman*).) "The trial court is charged with instructing upon every

United States District Court

For the Northern District of California

theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)

"That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Breverman*, *supra*, 19 Cal.4th at pp. 154-155.)

"[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could... conclude[]"' 'that the lesser offense, but not the greater, was committed. [Citations.] [¶] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.)

"'Involuntary manslaughter is... inherently an *unintentional killing*.'" (*People v. Hendricks* (1988) 44 Cal.3d 635, 643.) Defendant argues: "Contact wound to the crown of the head or not, this sort of senseless, sparsely described single-shot killing, with vague indications of an argument, is exactly the type of killing calling for instruction on involuntary manslaughter." Perhaps relying on expert evidence that gunshot residue (GSR) was found on Mary's left hand, and that it could have gotten there as the result of her attempt to push the gun away when it discharged, defendant posits that "[a] volatile victim ducking down could easily deflect a shot fired for emphasis *at ear level*; this could occur quite quickly and in an unpredictable manner, resulting in a strange wound to the head." (Italics added.)

There was *no* evidence that the shooting occurred in the manner described by defendant. On the other hand, there was evidence that Mary was shot at point blank range by a person placing a gun on the top of her head and discharging a bullet into her brain. Even if the GSR evidence was sufficient to support an inference that Mary raised her hand to push away the gun pointed at the top of her head, it did nothing to dispel the strong evidence that the gun was intentionally discharged. We agree with the Attorney General that "[t]he location of the entrance wound, and the vertical trajectory of the bullet, demonstrate that the killing was intentional." The trial court has no duty to instruct on involuntary manslaughter when there is no substantial evidence that the killing was unintentional, and there is substantial evidence that the killing was intentional. (*People v. Hendricks*, *supra*, 44 Cal.3d at p. 643; *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556 ["If a killing is intentional, no involuntary manslaughter instructions may be given."].) In addition, the jury found that defendant intentionally discharged the gun. Even accepting defendant's argument that the jury's finding did not resolve exactly how the killing occurred or whether defendant harbored implied malice, the finding did

United States District Court

For the Northern District of California

1    establish that the jury believed he intentionally discharged the single bullet that
2    killed Mary. Therefore, the failure to instruct on involuntary manslaughter
     could not have prejudiced defendant. (*People v. Lewis* (2001) 25 Cal.4th 610,
3    646.)

4    Ans. Ex. 8 at 29-31.

5          Respondent asserts that the failure of a state trial court to instruct on lesser-included

6    offenses in a non-capital case does not present a federal constitutional claim. *See Solis v.*

7    *Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th

8    Cir. 1998). However, "the defendant's right to adequate jury instructions on his or her theory

9    of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d

10   at 929 (citing *Bashor v. Risley*, 730 F.2d at 1240). *Solis* suggests that there must be

11   substantial evidence to warrant the instruction on the lesser included offense. 219 F.3d 929-

12   30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder

13   because evidence presented at trial precluded a heat of passion or imperfect self-defense

14   instruction; no duty to instruct on involuntary manslaughter because evidence presented at

15   trial implied malice).

16         In Petitioner's case, the evidence was not substantial to warrant the instruction on the

17   lesser included offense under the Ninth Circuit's decision in *Solis*. Under Supreme Court

18   precedent, due process does not require that an instruction be given unless the evidence

19   supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d

20   1012, 1029 (9th Cir. 2005). As discussed by the state appellate court, there was simply "*no*

21   evidence that the shooting occurred in the manner described by defendant." *See supra* at 25.

22   Rather "there was evidence that Mary was shot at point blank range by a person placing a

23   gun on the top of her head and discharging a bullet into her brain." *Id.*

24         Furthermore, even if we assume the trial court erred, Petitioner cannot show actual

25   prejudice. *See Brecht*, 507 U.S. at 637. The state court noted that the jury specifically found

26   that Petitioner intentionally discharged the gun. *See supra* at 25. Accordingly, it cannot be

27   said that a failure to give an instruction on the lesser offense had a "substantial and injurious

28   effect or influence" on the jury's verdict since the jury did not believe that the shooting of

26

Mary was other than intentional. *Brecht*, 507 U.S. at 637. Accordingly, the Court is not convinced that the trial court committed an instructional error in this respect such that the resulting conviction violated due process. *See Estelle*, 502 U.S. at 72. Petitioner is not entitled to habeas relief on this claim, and it is DENIED as without merit.

**B.     Instruction on "Other Crimes" (Claim 4)**

Petitioner's next claim is that the trial court's instruction on "other crimes" evidence deprived him of due process and a fair trial. Specifically, Petitioner claims that the court instructed the jury that it could consider Petitioner's drug use and possession and "implications of sex for drugs" on the issue of intent, which he asserts was "irrelevant and inflammatory evidence." Pet. Attach. at 4.

The Court of Appeal rejected this claim:

Defendant complains that the trial court instructed the jury as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime or crimes other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. [¶] It may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged, or, a motive for the commission of the crime charged." Defendant surmises that the "other crimes" to which the instruction referred included "drug use and possession, and implications of sex for drugs." We agree that the instruction must have been referring to evidence that defendant possessed and used drugs, [FN14] but we reject the suggestion that it referred to "implications of sex for drugs" for the reason that no such implications existed, as discussed at length earlier in this opinion. Defendant concedes that the instruction on motive was probably appropriate, but argues that extending the instruction to intent was error.

> FN14. Pursuant to a written defense motion, evidence of defendant's criminal record of convictions and prison sentence(s) was excluded, and an allusion to that in Bell's audio taped statement was blacked out of the transcript of the tape.

The court was not required to give this limiting instruction. However, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)

The intent at issue here included the intent to kill, implied malice (i.e, conscious disregard of the risk to human life), and the intentional discharge of a gun. In our view, all the evidence that was presented about the rampant drug use and sales by Mary and others at Mary's apartment, and the evidence that Mary grabbed something from defendant just before he shot her ("Give me that"), as well as evidence that defendant illegally possessed and used drugs on

the morning he killed Mary, was relevant not only to his motive for killing her but also to his intent when he pulled the trigger.

Assuming arguendo that the court erred in referring to intent in its instruction, no prejudice appears. The instruction was permissive, not mandatory, and it was largely protective, cautioning the jury against using the other crimes evidence to prove bad character or criminal disposition. Furthermore, the jury was instructed that "whether some instructions apply will depend upon what you find the facts to be" and was cautioned to "[d]isregard any instruction which applies to facts determined by you not to exist" and to refrain from concluding "that because an instruction has been given that I am expressing an opinion as to the facts." We presume the jury heeded the court's instructions. Finally, in light of the evidence presented that everyone else used drugs, the evidence that defendant also used drugs was not particularly noteworthy or inflammatory. We conclude that if there was error, it was not prejudicial to defendant. (*Watson, supra*, 46 Cal.2d 818.)

Ans. Ex. 8 at 31-33.

The Court must view the instructions as a whole as well as the trial record in determining whether the ailing instruction so infected the entire trial that it resulted in a conviction that violates due process. *See Estelle*, 502 U.S. at 72. Furthermore, in reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See id.* at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990).

In Petitioner's case, there was little likelihood that the jury applied the challenged instruction unconstitutionally or that it infected the entire trial to violate Petitioner's right to due process. As the state appellate court points out, the instruction was largely protective and warned the jury not to use the evidence of other crimes for improper purposes. Ans. Ex. 8 at 33. The trial court also instructed the jury to "[d]isregard any instruction which applies to facts determined by you not to exist" and to refrain from concluding "that because an instruction has been given that I am expressing an opinion as to the facts." *Id.* In addition, the state appellate court found the following evidence in the trial record relevant to show Petitioner's intent – i.e., to kill and to intentionally discharge the gun – when he shot Mary: rampant drug use and sales by Mary and others at her apartment, the fact that Mary grabbed something from Petitioner just before he shot her, and the fact that Petitioner illegally

1   possessed and used drugs on the morning he killed Mary. *See supra* at 27-28. Accordingly,

2   in context of the instructions as a whole and the trial record, there was little likelihood that

3   the jury would improperly consider Petitioner's other crimes in deciding whether he had the

4   necessary intent for second degree murder and the firearm enhancements.

5        Lastly, the state appellate court properly concluded that Petitioner was not prejudiced

6   by the instruction's reference to his other crimes. There was undisputed and overwhelming

7   evidence that everyone else used drugs, and the fact that Petitioner also used drugs "was not

8   particularly noteworthy or inflammatory." *See supra* at 28. In addition, the trial court's

9   other cautionary instructions made it unlikely that the instruction at issue had a substantial

10  and injurious effect on the verdict. *See Brecht*, 507 U.S. at 637. Accordingly, this claim is

11  DENIED as without merit.

12       **C.    CALJIC No. 2.11.5 (Claim 5)**

13       Petitioner claims that the trial court's use of the 2004 version of CALJIC No. 2.11.5

14  violated his rights of confrontation, to due process and a fair trial because it "unfairly

15  hamstrung defense counsel's efforts to test and refute the credibility of" three witnesses who

16  could have faced potential murder prosecution as accomplices. Pet. Attach. at 5.

17       The Court of Appeal reviewed the claim and rejected it:

18       Defendant argues that the trial court committed prejudicial error by instructing
         the jury regarding unjoined perpetrators with the 2004 version of CALJIC No.
19       2.11.5. The instruction provided: "There has been evidence in this case
         indicating that a person other than the defendant was or may have been
20       involved in the crime for which the defendant is on trial. [¶] There may be
         many reasons why that person is not here on trial; therefore, do not speculate or
21       guess as to why the other person is not being prosecuted in this trial or whether
         he has been or will be prosecuted. Your duty is to decide whether the People
22       have proved the guilt of the defendant on trial."

23       Defendant contends it was reversible error to give CALJIC No. 2.11.5 in this
         case because Bell, Lampkin and Maylene could have faced a potential murder
24       prosecution as accomplices, and accomplice instructions were given as to
         Lampkin and Bell. He argues that the 2004 version of CALJIC No. 2.11.5
25       "chills jurors' consideration of significant accomplice witness bias going to
         credibility." In *People v. Hernandez* (2003) 30 Cal.4th 835 (*Hernandez*), our
26       Supreme Court held that CALJIC No. 2.11.5 was improperly given, and that
         "trial courts should not give CALJIC No. 2.11.5 in an unmodified form when,
27       as here, a person who might have been prosecuted for the crime has testified at
         trial." (*Id.* at p. 875.) In that case, crucially, "standard instructions on
28       accomplice liability" were not given. (*Id.* at p. 877.)

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

The Attorney General argues that the 2004 revision of CALJIC No. 2.11.5 avoids the vice of the instruction given in *Hernandez* because the current version does not tell the jury "do not discuss or give any consideration to why the other person is not being prosecuted." (*Hernandez, supra*, 30 Cal.4th at p. 875.) Therefore, it does not discourage the jury from discussing or considering otherwise appropriate instructions on witness credibility. (*People v. Fonseca* (2003) 105 Cal.App.4th 543, 550 [suggesting that "speculate" or "guess" be used instead of "discuss" and "consider"].) Conceding that it is nonetheless "inadvisable" to give CALJIC No. 2.11.5 when a person subject to prosecution testifies, he argues that our Supreme Court has repeatedly held that there is no error in giving CALJIC 2.11.5 when standard instructions on accomplice liability and witness credibility are also given. (*Hernandez*, at p. 877; *People v. Brown* (2003) 31 Cal.4th 518, 561.) We agree, and we find no prejudicial error.

CALJIC No. 2.11.5 applies to people who may have been involved in the crime, whether or not they qualify as accomplices. (*William, supra*, 16 Cal.4th at p. 226.) "The purpose of the challenged instruction is to discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offense, and also to discourage speculation about the eventual fates of unjoined perpetrators." (*People v. Price* (1991) 1 Cal.4th 324, 446.) Another purpose for the instruction "is to focus the jury's attention on an individualized evaluation of the evidence against the person on trial without extraneous concern for the fate of other participants *irrespective* of their culpability." (*People v. Cox* (1991) 53 Cal.3d 618, 668, italics added, fn. omitted.)

"'CALJIC No. 2.11.5... should not be given when a nonprosecuted participant testifies because the jury is entitled to consider the lack of prosecution in assessing the witness's credibility.'" (*Williams, supra*, 16 Cal.4th at p. 226.) Arguably, this limitation on instructing with CALJIC No. 2.11.5 did not apply here to witness Bell because he had been prosecuted, albeit for a lesser crime. Of the two witnesses who were named in the accomplice instructions, clearly Bell was the more important witness against defendant. By all accounts, Lampkin slept through the events.

More importantly, our Supreme Court has declined to label a mistake in giving CALJIC No. 2.11.5 as error in cases such as this. (*People v. Jones* (2003) 30 Cal.4th 1084, 1113-1114.) In *Jones*, the court explained: "As defendant correctly observes, we have often said that trial courts should not give CALJIC No. 2.11.5 in an unmodified form when, as here, a person who might have been prosecuted for the crime has testified at trial. [Citations.] The impact of this mistaken instruction, however, was ameliorated because the court gave proper instructions that in assessing the credibility of witnesses the jury could consider '[t]he existence or nonexistence of a bias, interest, or other motive' and '[t]he witness'[s] prior conviction of a felony.' (CALJIC No. 2.20.) The jury was again instructed: 'The fact that a witness has been convicted of a felony... may be considered... only for the purpose of determining the credibility of the witness.' (CALJIC No. 2.23.) Finally, the jury was told that the testimony of an accomplice should be viewed with mistrust. (CALJIC No. 3.18.) ... We have declined to label a mistake in the giving of CALJIC No. 2.11.5 as error when, as here, 'the instruction is given with the full panoply of witness credibility and accomplice instructions.'" (*Ibid.*)

As in *Jones*, the trial court here gave proper instructions that in assessing the

1   credibility of a witness the jury could consider the existence or nonexistence of
2   a bias, interest, or other motive and the witness's prior conviction of a felony.
    (CALJIC No. 2.20.) The court also instructed that the fact that a witness had
3   been convicted of a felony or a misdemeanor may be considered only for the
    purpose of determining the credibility of the witness. (CALJIC No. 2.23.) In
4   addition, the court instructed the jury regarding accomplice testimony and told
    the jury that the testimony of an accomplice should be viewed with caution.
5   (CALJIC No. 3.18.) "'When [CALJIC No. 2.11.5] is given with the full
    panoply of witness credibility and accomplice instructions, as it was in this
6   case, [jurors] will understand that although the separate prosecution or
    nonprosecution of coparticipants, and the reasons therefor[e], may not be
7   considered on the issue of the charged defendant's guilt, a plea bargain or grant
    of immunity may be considered as evidence of interest or bias in assessing the
8   credibility of prosecution witnesses.'" (*People v. Lawley* (2002) 27 Cal.4th
    102, 162.) Even in cases in which the instruction should be clarified or omitted,
9   it is not error to give the instruction. (*Id.* at pp. 162-163.) Thus, the trial court
    did not err in giving CALJIC No. 2.11.5 here.

10  Ans. Ex. 8 at 33-36.

11         Petitioner's claim is without merit.  Contrary to his claim that CALJIC No. 2.11.5

12  "chilled jurors' consideration of significant accomplice witness bias," Pet. Attach. at 5, the

13  jury was in fact given other instructions, including CALJIC No. 2.20 and CALJIC No. 2.23,

14  which permitted the jury to consider bias, interest, other motive, and prior convictions –

15  felony or misdemeanor – in assessing the credibility of a witness. *See supra* at 30.  The trial

16  court also instructed on CALJIC No. 3.18 which specifically advised the jury to view

17  accomplice testimony with caution.  *Id.*  Viewing the instructions as a whole, it does not

18  appear that CALJIC No. 2.11.5 so infected the entire trial that it resulted in a conviction that

19  violates due process.  *See Estelle*, 502 U.S. at 72.  Nor is there a "reasonable likelihood" that

20  the jury applied the challenged instruction unconstitutionally since the jury received the "full

21  panoply of witness credibility and accomplice instructions." *See id.* at 72 & n.4; *Boyde*, 494

22  U.S. at 380.

23         Even assuming that CALJIC No. 2.11.5 was given in error, the error was harmless

24  because the other instructions given regarding witness credibility discussed above

25  ameliorated the impact of the mistaken instruction.  *See supra* at 30.  Any mistake was cured

26  by the instructions read as a whole.  *See Allen v. Woodford*, 366 F.3d 823, 839-840 (9th Cir.

27  2004).  The state courts' rejection of this claim was not contrary to, or an unreasonable

28  application of, clearly established Federal law under § 2254(d)).  Accordingly, this claim is

DENIED as without merit.

**D.    CALJIC No. 2.21.2 (Claim 6)**

Petitioner's last jury instruction claim is that the trial court's use of CALJIC No. 2.21.2 violated his due process rights because it lowered the prosecution's burden of proof.

The Court of Appeal rejected this claim under state supreme court precedent:

> Defendant argues the court erred in giving CALJIC 2.21.2, which states: "You may reject the whole testimony of a witness who willfully has testified falsely to a material point unless, from all the evidence, you believe *the probability of truth* favors his or her testimony in other particulars." (Italics added.) Relying primarily on *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1046, defendant contends the "probability standard" referenced in CALJIC No. 2.21.2 improperly "permits jurors to apply a probability standard to the dispositive testimony in a case." This argument has been rejected in *People v. Riel* (2000) 22 Cal.4th 1153, 1200. (See also, *People v. Nakahara* (2003) 30 Cal.4th 705, 714.) Defendant acknowledges this, but submits, for the purposes of exhausting state remedies, "that the unnecessary probability reference... constitutes federal constitutional error." We are bound by the holdings in *Riel* and *Nakahara* to reject defendant's argument in this case. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Ans. Ex. 8 at 36.

Respondent asserts that the Ninth Circuit specifically found that the CALJIC No. 2.21.2 did not violate due process in *Turner v. Calderon,* 281 F.3d 851 (9th Cir. 2002).  In *Turner*, the court denied a certificate of appealability on a claim that the use of the instruction violated due process based on its conclusion that because the jury "remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible," CALJIC No. 2.21.2 "could not be applied in a way that challenged the Constitution."  *Id.* at 865-66 (citing *Cupp v. Naughton*, 414 U.S. 141, 149 (1973)).  Respondent also points out that in addition to CALJIC No. 2.21.2, the jury was told to regard each jury instruction in light of the others, Clerk's Transcript ("CT") 579, which included instructions on circumstantial evidence, the presumption of innocence, the prosecution's burden of proof, and on reasonable doubt, CT 583-584, 604, 636, 645.

Viewing CALJIC No. 2.21.2 in light of the instructions as a whole, there was no reasonable likelihood that the jury applied the challenged instruction unconstitutionally, *Boyde*, 494 U.S. at 380, or that the alleged instructional error so infected the trial that it

1 | resulted in an unconstitutional conviction. *See Estelle*, 502 U.S. at 72. The jury was

2 | instructed to regard each instruction in light of the others, which included the prosecution's

3 | burden of proof, and the constitutionality of these other instructions are not at issue.

4 | Petitioner fails to show otherwise that the instruction lowered the prosecution's burden of

5 | proof. Accordingly, the state courts' rejection of this claim was not contrary to, or an

6 | unreasonable application of, clearly established Federal law. This claim is DENIED as

7 | without merit.

8 | **IV.   Admission of Witness's Prior Statements (Claim 7)**

9 | Petitioner claims that the admission of trial witness Bell's prior statement to the police

10 | violated his Sixth Amendment right to confrontation under *Crawford v. Washington*, 541

11 | U.S. 36 (2004).

12 | The Court of Appeal rejected this claim based on the fact that Bell actually appeared

13 | at trial and Petitioner had an opportunity for cross examination:

> In his original opening brief, defendant argues that the admission of Vincent Bell's pretrial statement to police violated his confrontation rights under *Crawford v. Washington, supra*, 541 U.S. 36, and *California v. Green* (1970) 399 U.S. 149, because Bell's failure of recollection precluded a full and fair opportunity to cross-examine him. In his supplemental opening brief, defendant acknowledges that "footnote 9 of *Crawford* appears to permit use of testimonial statements where the declarant appears at trial, as Bell did here." [FN15] Indeed, that appears to be the entire thrust of *Crawford*. Bell appeared at trial, and was subject to cross-examination. The admission of his prior inconsistent statement to police did not violate *Crawford*. Nor was his statement made inadmissible by *Green*. Notwithstanding defendant's assertion that "Bell credibly claimed complete lack of recollection of the statement," the court expressly found that Bell willfully pretended not to remember and admitted the pretrial statement on that basis. In addition, the jury was instructed: "If you disbelieve a witness' testimony that he or she no longer remembers a certain event, that testimony is inconsistent with the prior statement or statements by him or her describing that event." Here, on direct examination, Bell was asked to explain statements he made to police; he was subject to cross-examination; and he was excused subject to recall. All the requirements of the Confrontation Clause and Evidence Code sections 1235 and 770 for the admission of a prior inconsistent statement were met. Here, as in *People v. Green* (1971) 3 Cal.3d 981, "[d]efendant thus had the opportunity to cross-examine him, but in effect declined to do so. Whether or not a witness is actually cross-examined, the fact the defendant has an adequate *opportunity* to carry out such an inquiry satisfies the confrontation clause." (*Id.* at p. 990.) We reject defendant's claim that his Sixth Amendment confrontation rights were violated by the admission of Bell's prior inconsistent statement to police as substantive evidence against him.

**United States District Court**
For the Northern District of California

FN15. Footnote 9 states, in relevant part: "Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 [*supra*]. It is therefore irrelevant that the reliability of some out-of-court statements '"cannot be replicated, even if the declarant testifies to the same matters in court."' [Citation.] The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford v. Washington*, *supra*, 541 U.S. at p. 59, fn. 9.)

Ans. Ex. 8 at 36-37.

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford*, 541 U.S. at 61. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).

Petitioner's claim is without merit because admission of Bell's prior statement did not violate *Crawford*. Petitioner's main issue is that he was unable to cross-examine Bell on the prior statement because of his failure to recollect it. However, as even Petitioner acknowledged in his brief to the state court, *Crawford* explicitly states that the Confrontation Clause does not bar the admission of testimonial hearsay, i.e., prior statements, when the declarant appears for cross-examination at trial. 541 U.S. at 59 n.9. The Confrontation Clause was satisfied because Petitioner had an adequate opportunity to cross-examine Bell on

34

the prior statement even if he in effect declined to do so.  Accordingly, the state courts'
rejection of this claim was not contrary to, nor an unreasonable application of, Supreme
Court precedent.

**V.      Cumulative Effect (Claim 8)**

Petitioner's cumulative error argument is also without merit.  A cumulative error
claim allows for habeas relief when, although no single error independently warrants reversal
or rises to the level of a constitutional violation, the effect of multiple errors caused the
petitioner to suffer undue prejudice.  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.
1996) ("Where ... there are a number of errors at trial, 'a balkanized, issue-by-issue harmless
error review' is far less effective than analyzing the overall effect of all the errors" in the
trial).  However, where there is no single constitutional error existing, nothing can
accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939,
957 (9th Cir. 2002).

Here, Petitioner has failed to demonstrate even a single constitutional error that had a
prejudicial effect.  *Id.*  The state courts' rejection of this claim was not contrary to or an
unreasonable application of Supreme Court precedent.  Accordingly, his claim of cumulative
error is DENIED.

**VI.     Denial of Continuance (Claim 9)**

Petitioner claims that the trial court's refusal to grant a continuance request deprived
him of due process and the right to counsel of his choice.

The state appellate court reviewed the context of the request and then rejected the
claim after finding the trial court did not abuse its discretion in denying the continuance:

> Defendant argues that the court erred and denied him due process as well as his
> right to counsel of choice when, on January 6, 2006, the date set for sentencing
> on November 8, 2005, the date of the verdicts, the court denied him a
> continuance to secure the services of retained counsel from Sacramento. Out-
> of-town counsel did not himself appear at the hearing due to scheduling
> conflicts; instead, he sent local counsel to appear for him. No written motion to
> continue the sentencing hearing, which had been set for some time, was filed.
> Out-of-town counsel would not have been ready to proceed in any event. A
> continuance of the hearing was necessary to allow out-of-town counsel "to
> raise any potential ineffective assistance of counsel issues that might be
> appropriate."

The prosecutor opposed the motion to continue. He had first heard from out-of-town counsel at 4:00 p.m. on the previous day. He had filed an opposition to the new trial motion and was prepared to argue it; he had "a courtroom full of people" who were ready to appear at the sentencing hearing, and for that reason he had specifically called the court the day before to confirm that nothing had been filed to prevent the hearing from going forward. When he spoke with out-of-town counsel at 4:00 p.m., counsel had no knowledge of the case and was not clear if he had been retained to do a new trial motion or an appeal.

The court denied the motion as untimely, stating: "Counsel, with all due respect, I'm going to deny the motion. It is untimely.... The matter has been calendared, there's been no motion to continue the matter. [¶] The indication is that the attorney that wants to come in as counsel of record is not here and not ready to proceed, so I'm not really in a position to inquire of him... whether he has been retained for the motion or whatever. [¶] So it's inappropriate, and the court's going to deny the motion. But I appreciate you being here." A number of members of the victim's family attended the hearing, and Mary's mother made a statement to the court.

We review the court's denial of a motion to continue made for the purpose of securing retained counsel for abuse of discretion. (*People v. Jeffers* (1987) 188, Cal.App.3d 840, 850.) Relying on *People v. Trapps* (1984) 158 Cal.App.3d 265 (*Trapps*), defendant argues that the court abused its discretion here because the requested continuance was "modest," sentencing occurred on the very first appearance after the verdicts, the court did not question defendant or his trial attorney about the request and the sentencing hearing did not present any trial related concerns. We disagree.

In our view, *Trapps* is distinguishable. In that case, the Court of Appeal found error because the sentencing which took place was not lengthy, it had already been delayed three months by a Department of Corrections diagnostic study of defendant, other charges were still pending, and when the defendant asked for a continuance he had just returned from the study and was not unjustifiably dilatory in making his request. (*Trapps, supra*, 158 Cal.App.3d at pp. 272-273.)

Here, by contrast, the hearing to be postponed included not only sentencing matters but also a motion for a new trial; no additional charges were pending; despite the fact that the hearing date had been set for two months, the motion was brought on the day of the hearing, with no prior filing of a motion to continue and less than 24 hours' advance notice to the prosecutor, who had already arranged for the victim's family to appear; the victim's family did appear; but retained counsel did not appear, and so could not explain to the court why the request for a continuance was so tardy, and whether the contemplated continuance would be modest or lengthy. While it may be, as defendant suggests, that the court could have taken the victim impact statements and then continued the hearing (no one asked the court to do that), defendant has not carried his burden of demonstrating that, under all the circumstances present here, the trial court abused its discretion by denying defendant's day-of-hearing continuance. (*People v. Jeffers, supra*, 188 Cal.App.3d at p. 850.) We find no error.

Ans. Ex. 8 at 38-40.

    To establish a constitutional violation based on the denial of a continuance motion, a

**United States District Court**
For the Northern District of California

petitioner must show that the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (citation and internal quotation marks omitted) (finding trial judge acted within his broad discretion in denying motion for continuance to retain private counsel). In addition, the improper denial of a requested continuance warrants habeas relief only if there is a showing of actual prejudice to petitioner's defense resulting from the trial court's refusal to grant a continuance. *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997). A requisite abuse of discretion will be found if, after carefully evaluating all relevant factors, it is concluded that the denial is arbitrary or unreasonable. *See Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985), *cert. denied*, 475 U.S. 1099 (1986). When considering whether there has been an abuse of discretion, the court looks to four factors: (1) the degree of diligence by the defendant prior to the date beyond which a continuance was sought; (2) whether the continuance would have served a useful purpose if granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; and (4) the amount of prejudice suffered by the defendant as a result of the court's denial. *See id.*

The factors here do not weigh in favor of Petitioner. First of all, Petitioner did not act with diligence prior to the sentencing date on January 6, 2006, showing his efforts to obtain a continuance although he was aware that the date had been calendared two months prior on November 8, 2005. *See supra* at 35. In fact, no written motion was ever filed. Secondly, it is not clear whether the continuance would have served a useful purpose if granted because the out-of-town counsel was not available for questioning; it was only vaguely communicated that the continuance was needed "to raise any potential ineffective assistance of counsel issues that might be appropriate" but not whether it would be the basis for a new trial motion or an appeal matter. *Id.* Thirdly, the continuance would have been a great inconvenience to the prosecution who heard from out-of-town counsel for the first time the day before the sentencing hearing. Meanwhile, the prosecution already had several people present and ready to make statements at the hearing. Lastly, Petitioner cannot show that he

United States District Court

For the Northern District of California

1   was actually prejudiced by the denial of the continuance because the purpose of the

2   continuance was unclear.  Based on these factors, the state appellate court properly found that

3   the trial court did not abuse its discretion in denying the continuance because the decision

4   was neither arbitrary nor unreasonable, and Petitioner failed to set forth a justifiable reason

5   for the continuance.  *See Armant*, 772 F.2d at 556; *see Houston*, 533 F.3d at 1079.

6         In considering whether the denial of a continuance implicating a defendant's Sixth

7   Amendment right to counsel is an abuse of discretion, the Ninth Circuit has applied the

8   factors set forth in *United States v. Robinson*, 967 F.2d 287, 291 (9th Cir. 1992): (1) whether

9   the continuance would inconvenience witnesses, the court, counsel, or the parties; (2)

10  whether other continuances have been granted; (3) whether legitimate reasons exist for the

11  delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would

12  prejudice the defendant.  *See Mejia*, 69 F.3d at 314.  Consideration of these factors do not

13  weigh in favor of Petitioner.  With respect to the first factor, a continuance would have

14  greatly inconvenienced the prosecution and the friends and family of the victim who were

15  present to speak at the sentencing hearing because the request was made the day of the

16  hearing with no prior warning.  Secondly, there were no legitimate reasons for the delay as

17  Petitioner knew that the hearing was scheduled for two months after the verdict and yet he

18  did not file a written motion for a continuance in all that time.  Furthermore, the out-of-town

19  counsel was himself unsure for what purpose he had been retained, *i.e.*, whether to do a new

20  trial motion or an appeal, which also makes it unclear how the denial would prejudice

21  Petitioner.  Ultimately, this Sixth Amendment claims fails because the trial court did not

22  abuse its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in

23  the face of a justifiable request for delay." *Houston*, 533 F.3d at 1079 (quoting *Morris v.

24  Slappy*, 461 U.S. 1, 11-12 (1983)) (internal quotation marks omitted).  The state court's

25  rejection of this claim was not contrary to or an unreasonable application of Supreme Court

26  precedent.  Accordingly, this claim is DENIED.

27  **VII.   Sentencing Error (Claim 10)**

28         Petitioner's final claim is that the trial court committed a sentencing error with respect

38

to the firearm enhancements. The jury found true two enhancement allegations: (1) the

intentional discharge of a firearm (Pen. Code § 12022.53); and (2) personal firearm use (Pen.

Code § 12022.5). The court imposed a mandatory enhancement of 25 years to life under §

12022.53, and then imposed and stayed a four-year midterm enhancement under § 12022.5.

Petitioner claims that the trial court erred when it stayed the second firearm use enhancement

rather than striking it. Petitioner asserts that this error violated state court precedent and

thereby his right to due process.

State sentencing courts must be accorded wide latitude in their decisions as to

punishment. *See Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987), *cert. denied*,

488 U.S. 926, *and cert. denied*, 488 U.S. 981 (1988). Generally, therefore, a federal court

may not review a state sentence that is within statutory limits.[2] *See id.* Furthermore, federal

courts must defer to the state courts' interpretation of state sentencing laws. *See Bueno v.

Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993). Here, the state appellate court found that the trial

court properly stayed the second firearm enhancement under state law:

> ...[W]e conclude that when the jury has found true an enhancement
> allegation under section 12022.53, and for the same count has also found
> true an enhancement allegation under section 12022.5, subdivision (a)(1),
> the trial court should impose both enhancements, but should stay executing
> the enhancement for section 12022.5, subdivision (a).

Ans. Ex. 8 at 43, citing *People v. Bracamonte*, 106 Cal.App.4th 704, 713-714 (2003).

Lastly, "[a]bsent a showing of fundamental unfairness, a state court's misapplication

of its own sentencing laws does not justify federal habeas relief." *Christian v. Rhode*, 41

F.3d 461, 469 (9th Cir. 1994). Therefore, even if there was an error in sentencing, there has

been no showing of fundamental unfairness in Petitioner's case. Petitioner is not entitled to

habeas relief on this claim.

---

[2] However, there are exceptions when the constitutional guarantee of due process is fully applicable at sentencing. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977). A federal court may vacate a state sentence imposed in violation of due process; for example, if a state trial judge (1) imposed a sentence in excess of state law, *see Walker*, 850 F.2d at 476; or (2) enhanced a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error, *see United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995); *Walker*, 850 F.2d at 477. The trial court in Petitioner's case committed neither of these errors.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: <u>March 20, 2013</u>

JEFFREY S. WHITE
United States District Judge

1

2                        UNITED STATES DISTRICT COURT

3                                    FOR THE

4                        NORTHERN DISTRICT OF CALIFORNIA

5

6
    JIM CARTER BYNUM,
7                                              Case Number: CV09-02326 JSW
                Plaintiff,
8                                              **CERTIFICATE OF SERVICE**
      v.
9
    BEN CURRY et al,
10
                Defendant.
11                                        /

12   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.
13   District Court, Northern District of California.

14   That on March 20, 2013, I SERVED a true and correct copy(ies) of the attached, by placing
     said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by
15   depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
     delivery receptacle located in the Clerk's office.
16

17

18   Jim Carter Bynum
     F12050
19   P.O. Box 4000
     Vacaville, CA 95646-4000
20

21
     Dated: March 20, 2013
22                                             Richard W. Wieking, Clerk
                                               By: Jennifer Ottolini, Deputy Clerk
23

24

25

26

27

28

**United States District Court**
For the Northern District of California